_____ FILED   ___ ENTERED
_____ LOGGED _____ RECEIVED

5:33 pm, Sep 20 2023

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

**UNITED STATES OF AMERICA**

**v.**

**DEVIN GRAY,**

      **Defendant**

**IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR SEARCH AND SEIZURE WARRANTS**

Case No. ___1:23-mj-02360-BPG___

**UNDER SEAL**

Case No.
**UNDER SEAL**

1:23-mj-02361-BPG
1:23-mj-02362-BPG
1:23-mj-02363-BPG
1:23-mj-02364-BPG
1:23-mj-02365-BPG

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

    I, Eugene Theisen, Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), being duly sworn, depose and state as follows:

**I.**    **PURPOSE OF THIS AFFIDAVIT**

    1.    I submit this affidavit in support of a criminal complaint (and request for issuance of an arrest warrant) charging the defendant Devin GRAY (year of birth 1991) with the following offenses: 18 U.S.C. § 922(g)(1) (possession of a firearm/ammunition by a convicted felon), 18 U.S.C. § 922(o)(1) (possession or transfer of a machinegun), and 21 U.S.C. § 841(a) (possession with the intent to distribute and distribution of controlled dangerous substances (CDS)).

    2.    I also submit this affidavit in support of search warrants authorizing the search of:

    a.  **76 Rumelia Circle, Essex, Maryland 21221 ("TARGET LOCATION").** TARGET LOCATION is a single-family rowhome. On the front of TARGET LOCATION is a black interior door opening inward from left to right. The numbers "76" are written above the front door of the residence. TARGET LOCATION is further described in Attachment A1.

    b.  **The person of Devin GRAY ("TARGET SUBJECT"),** a black male, approximately 5'10" tall and 170 pounds, with a year of birth 1991, and a Maryland

state Identification number ending in 9428. A photograph of GRAY is included in Attachment A2.

c. **A Gray Kia Sedona Van** with Virginia License Plate D5585 ("**TARGET VEHICLE**"). The vehicle is used by Devin GRAY. The vehicle license is listed as a dealer license plate. A query was completed on the license plate with no results. TARGET VEHICLE is further described in Attachment A3.

d. **A cellular phone bearing call number 667-379-4122 (TARGET TELEPHONE 1)**. The IMEI, subscriber, and subscriber address are unknown. The service provider is Verizon. The phone is believed to be used by Devin GRAY. The phone is also described in Attachment A4.

e. **A cellular phone bearing call number 443-931-6621** with an IMEI of 352853886049085 **(TARGET TELEPHONE 2)** with a subscriber of Crystal Smith with a subscriber address of 1831 Druid Hill Avenue, Baltimore, Maryland 21217 and service provided by AT&T. It is believed this phone is used by Devin GRAY. The phone is further described in Attachment A5. The two aforementioned cellular phones are referred to together as the TARGET TELEPHONES.

3. As a result of an ongoing investigation into GRAY, there is probable cause to believe that the **TARGET LOCATION, TARGET SUBJECT**, **TARGET VEHICLE**, and **TARGET TELEPHONES** contain evidence, fruits, and instrumentalities related to the following offenses: 18 U.S.C. § 922(g)(1) (possession of a firearm/ammunition by a convicted felon), 18 U.S.C. § 922(o)(1) (possession or transfer of a machinegun), 21 U.S.C. § 846 (conspiracy to distribute controlled dangerous substances ("CDS")), and 21 U.S.C. § 841(a) (possession with the intent to distribute and distribution of CDS) (the "Subject Offenses"). As to the **TARGET LOCATION,** the **TARGET SUBJECT**, and the **TARGET VEHICLE**, the evidence, fruits, and instrumentalities likely to be found are listed in Attachment B1. As to the **TARGET TELEPHONES**, the evidence, fruits, and instrumentalities likely to be found are listed in Attachment B2.

II.    **AFFIANT BACKGROUND**

4.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18.

5.      I have been an ATF Special Agent since 2017. I am currently assigned to the ATF Baltimore Field Division, Baltimore VI Field Office. I have attended the United States Department of Homeland Security's Criminal Investigator Training Program and ATF's Special Agent Basic Training, both located in Glynco, Georgia, for a combined period of 26 weeks. I have also received extensive training, both formal and on-the-job, related to federal firearms and narcotics laws administered under Titles 18, 21 and 26 of the United States Code.

6.      Prior to my employment with ATF, I graduated from the Uniformed Police Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. I was also a Federal Police Officer for the Supreme Court of the United States Police Department for seven and a half years, during which time I assisted with and made arrests related to protests and other federal and local violations. I was further a member of Associate Justice Clarence Thomas's preferred dignitary protection team. I graduated from Frostburg State University with a bachelor's degree in Law and Society, with a concentration in criminal justice.

7.       As an ATF agent, I have conducted and participated in investigations concerning violations of federal firearm and controlled substance laws, and the commission of violent crimes. I have received specialized training regarding, and have personally participated in, various types of investigative activities, including, but not limited to, the following: (a) physical surveillance; (b) the debriefing of defendants, witnesses, informants, and other individuals who have knowledge concerning violations of federal firearms and controlled substance laws; (c) the execution of search

warrants; (d) the consensual monitoring and recording of conversations; (e) electronic surveillance through the use of pen registers; and (f) the handling, maintenance, and examination of evidence to include wireless telephones and computers.

8.      I have participated in numerous investigations targeting violent DTOs operating throughout Baltimore City. I have conducted covert surveillance of suspected narcotics traffickers and violent offenders. I have interviewed defendants who have been charged for violation of Title 18 and Title 21. Through my knowledge, training, and experience, I have become familiar with the manner in which illegal firearms and narcotics are transported, stored, and distributed, and the manner in which firearms and narcotics traffickers communicate with one another.

9.      Based on my training, knowledge, and experience as a SA with the ATF, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of controlled dangerous substances. From my training, knowledge, experience, and conversations with other agents and officers, I am familiar with the manner in which illegal firearms/narcotics are transported, stored, and distributed, and the methods of payment for such. I am also familiar with the techniques employed by narcotics traffickers to keep records of their narcotics trafficking activities, to conceal proceeds of their illegal conduct, and to evade law enforcement by utilizing counter-surveillance, false identifications, and multiple means of communication and transportation.

10.      Based upon that training and experience, I have learned the following:

a.      Drug traffickers keep and maintain records of their various activities. Such records are regularly concealed in a suspect's automobile, residence, office, and/or on his person. These records take various forms. Documents commonly concealed by traffickers that contain evidence of their various activities include, but are not limited to, notes in code, deposit slips, wired money transactions, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private,

money orders, and other papers relating to the ordering, transportation, sale, and distribution of controlled dangerous substances or other such documents that contain information that can be used to identify co-conspirators. These items are kept in locations that are considered safe by the drug traffickers, such as safety deposit boxes, residences, vehicles, and on their person, where they have ready access to them. Drug traffickers often have several residences, decreasing the likelihood of detection by law enforcement;

b.      Drug traffickers may use computers or other electronic storage media, including smart phones and/or other cellular phones, to store the types of records and documents listed in paragraph "a";

c.       Drug traffickers often have large amounts of cash, which they use to maintain and finance their narcotics business. This cash, along with financial instruments and evidence of financial transactions relating to narcotics trafficking activities, is typically concealed in their residences or vehicles;

d.      Drug traffickers use cellular telephones, pagers, and other electronic communications devices to facilitate illegal drug transactions. The electronically stored information on these devices is of evidentiary value in identifying other members of the drug trafficking conspiracy and establishing the relationship between these individuals, including photographs and other identifying information;

e.      Drug traffickers commonly possess—that is on their person, in their vehicles, at their residence, and/or inside their "stash locations"—firearms and other weapons to protect and secure their narcotics and money from loss to law enforcement agents or other members of the criminal element that are motivated by greed;

f.      Drug traffickers commonly possess—that is on their person, in their vehicles, at their residence, and/or inside their "stash locations"—packaging material, cutting agents, digital scales, and other items used in the preparation and packaging of controlled substances;

g.      Drug traffickers commonly use vehicles to conceal and transport ledgers, packaging materials, cutting agents, digital scales, illegal drugs, proceeds from illegal drug sales, and other items associated with illegal drug trafficking. These vehicles are often purchased with illegal drug proceeds and are often registered in the names of other persons to conceal the identity of the drug trafficker who uses the vehicle.

h.      Drug traffickers will use more than one cellular phone for their drug trafficking business and often change their cellphones following the arrest of a member of their DTO or at random in order to frustrate law enforcement efforts.

11.     This affidavit is based upon evidence and information developed through surveillance, controlled purchases of fentanyl, firearms (one machinegun), and confidential source

information. This affidavit does not contain all of the information known to me regarding this investigation. I have included in this affidavit only the facts that I believe are sufficient to support a probable cause finding for the issuance of the requested search warrant. I have not, however, omitted any information that would defeat a determination of probable cause. In addition, the summaries do not include references to all statements made on the topics that are described. All quotations from recorded conversations are based upon my personal review of the recordings. This affidavit is not intended to include each, and every fact and matter observed by me or known to the Government.

III.    **PROBABLE CAUSE**

12.     In November of 2022, a confidential informant ("CI-1") 1 began to conduct controlled purchases[2] of narcotics from GRAY. At that time, CI-1 was a paid informant for the Hagerstown Police Department. Hagerstown Police instructed CI-1 to go to the 400 block of Johnathan Street in Hagerstown, Maryland to purchase narcotics. CI-1 was approached in the 400 block of Johnathan Street by GRAY. At the time of the initial operation, GRAY was not a target of the original Hagerstown Police undercover operation. CI-1 purchased a mixture or substance

---

1       CI-1 has been a paid informant for the ATF since March of 2023 and has provided reliable information to law enforcement on multiple occasions in the past. Additionally, in this and prior investigations with which CI-1 assisted, much of the information provided by CI-1 has been corroborated by law enforcement through other investigative techniques such as physical surveillance, video surveillance, and the review of recordings of the controlled purchases. Specifically, CI-1's information and involvement in controlled purchases has helped further current federal investigations, and CI-1 has also provided the Hagerstown Police Department and the DEA with information that has led to arrests.

2       During a controlled purchase, CI-1 is equipped with a device that is capable of capturing audio and video. Investigators can also listen to the controlled purchase in real time to ensure the safety of CI- 1 and the integrity of the evidence being sought.

containing a detectable amount of fentanyl from GRAY on two occasions. During at least one of those operations, GRAY verbally provided CI-1 with telephone number 223-220-9228 and the number for **TARGET TELEPHONE 1** during these drug transactions to facilitate future sales. GRAY told CI-1 to contact him anytime on the above numbers to purchase drugs.

### April 5, 2023 Controlled Operation

13.     During the week of April 2, 2023, GRAY called and texted CI-1 using telephone number 223-220-9228. GRAY indicated to CI-1 that he was in possession of a fully automatic, 9mm "ghost gun". I know a "ghost gun" is a street name for a Polymer80 INC gun that does not have a serial number. This makes the firearm generally untraceable. GRAY sent a photo from telephone number 223-220-9228 of the fully automatic "ghost gun". The photo depicts a tan in color handgun with Polymer80 INC marked on the side. Also pictured is a large gray object protruding from the slide back plate. I know from my training, knowledge, and experience that this is where a handgun is altered to allow the firearm to shoot fully automatic. This added device is commonly known as a "switch".

14.     CI-1 and GRAY agreed to meet on April 5, 2023. GRAY told CI-1 to meet him at 1213 Rossiter Avenue, Baltimore, MD 21239. Investigators were familiar with this address from monitoring recorded jail calls[3] from 2021 between GRAY (who was incarcerated at the time) and a female caller using a telephone phone number of 443-468-4316. Investigators searched that telephone number in Lexus Nexus and identified the user of the phone as Dymond Pigott. A Maryland Motor Vehicle Administration search of Dymond Pigott was conducted to reveal that

---

3       Any jail calls referred to herein were recorded pursuant to standard jailhouse call monitoring procedures. Such calls are preceded by a recorded message in which the participants of a call are advised that the call is subject to monitoring and/or recording.

Pigott had a Blue Pontiac Sedan bearing a Maryland Registration of 5FF8685 registered at 1213 Rossiter Avenue Apt 3C, Baltimore, Maryland. Investigators also observed this same vehicle in Hagerstown, Maryland on February 16, 2023, in an area GRAY is known to sell narcotics. On February 17, 2023, investigators conducted surveillance at 1213 Rossiter Avenue Apt 3C, Baltimore, Maryland and observed GRAY exit 1213 Rossiter Avenue and enter the Blue Pontiac Sedan.

15.     On April 5, 2023, ATF used CI-1 to make a controlled purchase of a firearm and suspected fentanyl from GRAY at 1213 Rossiter Avenue. At approximately 1:00 p.m., using coded language, GRAY again called CI-1 using telephone number 223-220-9228 to verify CI-1 was on the way to make the purchase. CI-1 told GRAY he/she was enroute, indicating he/she was ready to purchase the gun. As with other controlled purchases, investigators provided CI-1 with a GPS tracker and a recording/transmitting device so investigators could monitor and record CI-1's conversations.

16.     At approximately 2:51 p.m., CI-1 arrived in the front of 1213 Rossiter Avenue. CI- 1 was greeted by GRAY and told to park behind **TARGET VEHICLE**. GRAY then instructed CI- 1 to enter the **TARGET VEHICLE**. During the conversation, GRAY told CI-1 words to the effect of "I don't even got no switch." Investigators believe that GRAY was implying that he was in possession of a firearm separate from the firearm he was selling to CI-1. As discussed above, investigators also know that a "switch" is a device that makes a firearm fully automatic. GRAY went on to confirm that the firearm being sold was fully automatic. GRAY provided CI-1 with one fully automatic Polymer80 (no serial number) 9mm caliber firearm and seven rounds of 9mm ammunition. CI -1 provided GRAY with $3,150 of pre-recorded ATF agent cashier funds.

17.     GRAY informed CI-1 that his brother was on his way with the "down." I know from my training, knowledge and experience that "down" is a street term for fentanyl/heroin mixture. GRAY informed CI-1 that he had good "cane" around the corner from 1213 Rossiter Avenue. I know from my training, knowledge, and experience that "cane" is a street term for cocaine. GRAY also said that he goes back and forth from Baltimore to Hagerstown to sell drugs. GRAY told CI-1 that he was recently arrested in Hagerstown, and he needed money for a lawyer.

18.     At approximately 3:31 p.m., GRAY provided CI-1 with one clear bag containing twenty-five clear capsules of suspected fentanyl. This suspected fentanyl was delivered by the individual that GRAY referred to as his brother.

19.     At the conclusion of controlled purchase, investigators took the firearm and suspected fentanyl. Investigators hand delivered the firearm to the ATF's Firearm Technology Criminal Branch located in Martinsburg, West Virginia. Examiners completed a function test and examination and concluded that the firearm had the components to be considered a machine gun. The suspected fentanyl was taken to the Baltimore Police Department's Lab to be analyzed. The suspected fentanyl was tested by the Baltimore Police Department Lab and came back positive for fentanyl.

**April 27, 2023 Controlled Operation**

20.     During the week of April 22, 2023, GRAY sent text messages to CI-1 from **TARGET TELEPHONE 1**. GRAY told CI-1 that he was in possession of another firearm for sale. GRAY sent a photo from **TARGET TELEPHONE 1** of the firearm. The photo showed a black Mossberg model MC1SC handgun.

21.     CI-1 and GRAY agreed to meet on April 27, 2023. GRAY told CI-1 to meet him at 1213 Rossiter Avenue, Baltimore, Maryland 21239.

22.     On April 27, 2023, ATF used CI-1 to make a controlled purchase of a firearm from GRAY at 1213 Rossiter Avenue. Prior to the controlled purchase, GRAY called CI-1 using **TARGET TELEPHONE 1** to verify he/she was on the way to purchase the firearm. CI-1 told GRAY he/she was enroute to purchase the gun. Investigators provided CI-1 with a GPS tracker and a recording/transmitting device so investigators could monitor and record CI-1's conversations.

23.     At approximately 1:42 p.m., CI-1 arrived at 1213 Rossiter Avenue. GRAY used **TARGET TELEPHONE 1** to call CI-1 and told CI-1 to enter **TARGET VEHICLE**. CI-1 and GRAY interacted inside **TARGET VEHICLE**. GRAY provided CI-1 with one Mossberg model MC1SC 9mm caliber handgun (serial number 047440CP) and ten rounds of 9mm ammunition. CI-1 provided GRAY with $1,200 of pre-recorded ATF agent cashier funds. GRAY informed CI-1 that he could not go to the store and buy a gun. Investigators believe that GRAY was telling CI-1 that he is a convicted felon and is prohibited from possessing firearms and ammunition. GRAY went on to tell CI-1 that he could provide him/her with more firearms.

24.     At the conclusion of controlled purchase, investigators took control of the firearm.

### May 16, 2023 Controlled Operation

25.     On May 10, 2023, United States Magistrate Judge A. David Copperthite signed a federal search and seizure warrant for information associated with cellular device with call number 223-220-9228 and for **TARGET TELEPHONE 1**. It was determined at this time that telephone number 223-220-9228 was no longer functioning, and GRAY was using **TARGET TELEPHONE 1** as his primary telephone.

26.     On May 16, 2023, ATF used CI-1 to make a controlled purchase of a firearm from GRAY at 3539 Elmley Avenue. Prior to the controlled purchase, GRAY called CI-1 using **TARGET TELEPHONE 1** to verify he/she was on the way to purchase the firearm. CI-1 told

GRAY he/she was enroute to purchase the gun. Investigators provided CI-1 with a GPS tracker and a recording/transmitting device so investigators could monitor and record CI-1's conversations.

27.     GRAY informed CI-1 that he needed a ride to 3539 Elmley Avenue to retrieve the gun. CI-1 agreed to drive GRAY to the location to ensure that the transaction was completed.

28.     At approximately 3:15 p.m., CI-1 and GRAY arrived at 3539 Elmley Avenue. CI-1 observed GRAY call an unknown individual. Given the timing, and GRAY's previous use of **TARGET TELEPHONE 1**, investigators believe that GRAY made the call on **TARGET TELEPHONE 1** (however as far as investigators can tell, CI-1 was not in a position to know the phone number GRAY used).[4]  Moments later, an unknown individual entered the vehicle of CI-1. GRAY and the unknown individual provided CI-1 with one Polymer80 model PF940C 9mm caliber handgun. CI-1 provided GRAY with $1,400 of pre-recorded ATF agent cashier funds. GRAY took a portion of the $1,400 and handed the other portion to the unknown individual. GRAY went on to tell CI-1 that he could provide him/her with more firearms.

29.     At the conclusion of controlled purchase, investigators took control of the firearm.

30.     A criminal history check was completed on GRAY. GRAY was convicted in the Baltimore City Circuit Court of a crime in 2021 for which he was sentenced to 5 years in prison with 3 years and 6 months of that sentence suspended. This sentence was followed by 3 years of supervised probation.   That conviction indicates that GRAY does have a prior conviction for a

---

4     Investigators have checked toll records for **TARGET TELEPHONE 1** and do not see a corresponding toll hit.   It is possible that GRAY might have made the call using an application that is not shown on phone records.   Your affiant has reviewed the video and audio recording of the operation and on the recording, GRAY can be heard talking to someone on the phone and providing directions to that person to come to them.    The informant was in the car, but the camera was not pointed in the direction of GRAY when the call was made.

term of imprisonment exceeding one year, and given the sentence, I believe GRAY would know that he had been convicted of a crime punishable by more than one year.

31.     The firearms and ammunition discussed herein, based on their appearance and preliminary examination, appear to be firearms and ammunition as defined in 18 U.S.C. § 921. The Mossberg firearm and the ammunition discussed herein were, based on my training and experience, manufactured outside the state of Maryland and therefore traveled in interstate or foreign commerce prior to their purchase in this state.

**Recorded Jail Calls**

32.     On July 14, 2023, ATF was informed that **TARGET TELEPHONE 1's** service with Verizon was suspended on July 4, 2023, for non-payment.  Investigators continued to receive location information from **TARGET TELEPHONE 1**, but GRAY was no longer using the phone to make calls.   Investigators queried **TARGET TELEPHONE 1** in Maryland's Correctional jail call system and uncovered that GRAY was in consent contact with an inmate by the name of Brandon Weldon.  Weldon is incarcerated at Jessup Correctional Institution.   Investigators listened to a recorded jail phone call on June 18, 2023, between Weldon and **TARGET TELEPHONE 2.**[5]  Investigators immediately recognized the voice using **TARGET TELEPHONE 2** as GRAY.  In this call Weldon referred to the caller of **TARGET TELEPHONE 2** as Devin GRAY.  The context by which Weldon happened to use GRAY's full name was the following: during the call, Weldon appeared to believe that GRAY was not paying attention to him. Weldon addressed the caller by the full name "Devin Gray" to get the caller's attention.

---

[5]     Your affiant found the **TARGET TELEPHONE 2** call by listening to a sampling of Weldon recorded jail calls until a caller, whose voice your affiant recognized as GRAY, engaged in a call. That was how **TARGET TELEPHONE 2** was identified.

33.     Investigators continued to monitor calls between Weldon and **TARGET TELEPHONE 2**.  On July 1, 2023, Weldon asked GRAY on **TARGET TELEPHONE 2** for a reason on why GRAY had been so hard to contact.  GRAY told Weldon that he needed to pay his other phone bill.  Investigators believe GRAY was referring to termination of the service connected to **TARGET TELEPHONE 1**.  GRAY went on to say that he was traveling to the mountains to go make some money.  Investigators believe that GRAY was telling Weldon that he was traveling to Hagerstown, Maryland to sell narcotics to make money.  GRAY has referred to Hagerstown as the mountains on several occasions.  GRAY is also known to travel to Hagerstown, Maryland to sell narcotics.

34.     Investigators believe that GRAY is now using **TARGET TELEPHONE 2** as his primary telephone.  Investigators most recently listened to a jail call between Weldon and GRAY recorded on August 16, 2023.  During this call GRAY told Weldon that he just finished with court and that his case was postponed.  Investigators queried Devin GRAY'S name in Maryland Judiciary Case Search which uncovered that on August 16, 2023, GRAY had a motions hearing in the Circuit Court for Washington County located in Hagerstown, Maryland.

35.     Based upon the foregoing, there is probable cause that GRAY uses or has used the **TARGET TELEPHONES** in furtherance of the sale of firearms and/or CDS and carries or has carried the phones with him while in possession of firearms and/or CDS in Baltimore, Maryland, and the surrounding areas.  With respect to **TARGET TELEPHONE 1**, GRAY used that phone in direct connection with two possessions and transfers of firearms as discussed above.  GRAY appears to have used a previous phone in connection with earlier gun and drug transactions, but drug-dealers often use multiple phones in connection with their activities and/or switch between phones.  Although GRAY does not appear to have service on **TARGET TELEPHONE 1**

currently, investigators continued to receive location information from **TARGET TELEPHONE 1** even after service was suspended on July 4, 2023.   Moreover, electronic information (including information such as that discussed in paragraph 10 above) related to **TARGET TELEPHONE 1'**s previous use as a drug-related phone may still be present on the phone even if GRAY is not using the phone actively.

36.     With respect to **TARGET TELEPHONE 2**, recorded jail call activity indicates that GRAY also uses **TARGET TELEPHONE 2.**   As discussed above, during a recorded consent jail call, GRAY told an incarcerated person that GRAY was traveling to the "mountains" to make money.    Investigators believe that this was a coded reference to traveling to Hagerstown to sell drugs.   GRAY's use of **TARGET TELEPHONE 2** to engage in what (in context) appeared to be a drug-related call provides reasonable cause to believe that drug-related evidence (such as that listed on Attachment B2) will be found on the phone.   Likewise, with respect to **TARGET TELEPHONES 1** and **2**, the fact that GRAY is the user of those phones combined with the evidence of his involvement in drug trafficking provide probable cause to believe that evidence, including that listed in Attachment B2, will be found on both phones (for the reasons discussed in paragraph 10).

### SURVEILLANCE AT TARGET LOCATION

37.     A License Plate Reader (LPR) query was conducted on the **TARGET VEHICLE**. The results of this LPR check showed **TARGET VEHICLE** parked in the unit block of Rumelia Circle on May 1, 2023, at approximately 3:23 am.

38.     On May 10, 2023, at approximately 9:40 am, investigators conducted surveillance at **TARGET LOCATION**.   Present in front of **TARGET LOCATION** was the **TARGET VEHICLE**.

39.     At approximately 9:50 am, investigators observed an unknown female exit **TARGET LOCATION** and enter the **TARGET VEHICLE**.   This unknown female departed **TARGET LOCATION** in the **TARGET VEHICLE**.

40.     On May 15, 2023, at approximately 8:15 am, investigators conducted surveillance at **TARGET LOCATION**.   Present in front of **TARGET LOCATION** was the **TARGET VEHICLE**.   At approximately 12:28 pm, investigators observed GRAY exit **TARGET LOCATION** and retrieve a black trash can from the common area located in front of the residence. GRAY brought the trash can from this common area to the front of **TARGET LOCATION**. Moments later, GRAY reentered **TARGET LOCATION**.   At approximately 1:12pm, investigators observed an unknown juvenile open the front of door of **TARGET LOCATION** and reenter **TARGET LOCATION** seconds later.   At approximately 1:37pm, investigators observed an unknown juvenile, an unknown female, and an unknown toddler exit **TARGET LOCATION** and enter the **TARGET VEHICLE**.   Moments later, they all departed in **TARGET VEHICLE**.

41.     On July 26, 2023, at approximately 7:38 am, investigators conducted surveillance at **TARGET LOCATION**.   At approximately 11:17 am, investigators observed GRAY exit **TARGET LOCATION** with a bag of trash.   GRAY took the bag of trash to the black trash can in front of **TARGET LOCATION**.   Moments later, GRAY reentered **TARGET LOCATION**.

42.     On August 28, 2023, at approximately 11:10 am, investigators conducted surveillance at **TARGET LOCATION**.   At approximately 11:16 am, investigators observed GRAY open the door to **TARGET LOCATION** and look out the front door.   Moments later, GRAY closed the door.   At approximately 1:30 pm, GRAY again opened the door to **TARGET LOCATION**, looked out the door and closed the door again.

**TARGET LOCATION BACKGROUND INFORMATION**

43.     A CLEAR[5] search was contacted on the **TARGET LOCATION.**   The search showed that Dymond Pigott has been residing at **TARGET LOCATION** since May 6, 2023. Investigators know that Dymond Pigott is the girlfriend of GRAY and that the couple share a child together.   Investigators gathered this information from listening to recorded jail calls that took place between GRAY and Dymond Pigott while GRAY was incarcerated.

44.     Investigators also know from previous surveillance that GRAY operated a vehicle registered to Dymond Pigott on February 17, 2023.

45.     Investigators reviewed the photo of Dymond Pigott provided by the Motor Vehicle Administration and were able to verify that the female seen during surveillance was Pigott. Investigators also noticed that Pigott listed height with the Motor Vehicle Administration is 4'9". This also matches the height of the female observed.   Investigators believe that the female that has been seen entering and exiting TARGET LOCATION is Dymond Pigott.   It is believed that GRAY, Dymond Pigott, and several juveniles live at **TARGET LOCATION.**

**GPS DATA ON GRAY'S CELLULAR DEVICE**

46.     On July 13, 2023, United States Magistrate Judge J. Mark Coulson signed and sealed warrants for receiving cellular phone location information and for the use of a cell site simulator to identify the location of **TARGET TELEPHONE 1**.

47.     Pursuant to the search warrant, investigators have been receiving GPS location information for GRAY's cellphone.   GPS information for the cellphone has commonly placed the device approximately .3 miles from the **TARGET LOCATION**, from between the hours of

---

5     CLEAR is a database used by law enforcement to search addresses for more information pertaining to that address.

5:00am and 8:00am between the dates July 15, 2023, to present.   This shows that GRAY is likely sleeping in the area covering the **TARGET LOCATION**, and therefore providing further evidence that he is living at the **TARGET LOCATION**.

48.     On August 24, 2023, United States Magistrate Judge J. Mark Coulson signed and sealed warrants for receiving cellular phone location information and for the use of a cell site simulator to identify the location of **TARGET TELEPHONE 2**.

49.     Pursuant to the search warrant, investigators have been receiving GPS location information for GRAY's cellphone.   During surveillance of the **TARGET LOCATION** on August 28, 2023, GPS information for **TARGET TELEPHONE 2** placed the device approximately .2 miles from the **TARGET LOCATION** (ping orders such as the one being used here provide particular locations, but the data received generally means that the phone may be within a reasonable radius of that location shown).   Moments after receiving this GPS information, investigators witnessed GRAY open the door to the **TARGET LOCATION.**   GPS information for **TARGET TELEPHONE 2** has commonly placed the device approximately 1 mile from the **TARGET LOCATION**, from between the hours of 5:00am and 8:00am between the dates August 24, 2023, to present (again, as discussed above, ping information will provide locations that are within the general area of where the phone may be).   This shows that GRAY is likely sleeping in the area covering the **TARGET LOCATION**, and therefore providing further evidence that he is living at the **TARGET LOCATION.**

## CONCLUSION

50.     Based on the foregoing, I submit that there is probable cause to believe that the defendant Devin GRAY has committed the federal offenses of 18 U.S.C. § 922(g)(1) (possession of a firearm/ammunition by a convicted felon), 18 U.S.C. § 922(o)(1) (possession or transfer of a

machinegun), and 21 U.S.C. § 841(a) (possession with the intent to distribute and distribution of CDS) (the "Subject Offenses").

51.     Based on the foregoing, I submit that there is probable cause to believe that within the **TARGET LOCATION, TARGET VEHICLE, TARGET TELEPHONES** and **TARGET SUBJECT** are fruits, evidence and instrumentalities of the above-described Subject Offenses.

WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue a criminal complaint and arrest warrant for the defendant Devin GRAY.   I also respectfully request that the Court issue search warrants for the **TARGET LOCATION, TARGET VEHICLE, TARGET TELEPHONES** and the **TARGET SUBJECT,** and authorize the seizure of the items described in Attachments B1 and B2, which constitute fruits, evidence and instrumentalities of violations of 18 U.S.C. § 922(g)(1) (possession of a firearm/ammunition by a convicted felon), 18 U.S.C. § 922(o)(1) (possession or transfer of a machinegun), 21 U.S.C. § 846 (conspiracy to distribute CDS), and 21 U.S.C. § 841(a) (possession with the intent to distribute and distribution of CDS).

_Eugene Theisen_
Eugene Theisen
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this ___6___ day of August 2023.



_Beth P. Gesner_
The Honorable Beth P. Gesner
United States Magistrate Judge
District of Maryland

18

**ATTACHMENT A1**
**Property to Be Searched**
**76 Rumelia Circle, Essex, Maryland 21221 (Target Location)**

    76 Rumelia Circle, Essex, Maryland 21221 (Target Location). Target Location is a single-family rowhome. On the front of Target Location is a black interior door opening inward from left to right. The numbers "76" are written above the front door of the residence.  A photo of the location is below:



**ATTACHMENT A2**
**Person to Be Searched**
**Devin GRAY**

A black male, approximately 5'10" tall and 170 pounds, with a year of birth 1991, and a Maryland State Identification number ending in 9428.   A photo of GRAY is below:



20

## ATTACHMENT A3
### Vehicle to Be Searched

A Gray Kia Sedona Van with Virginia License Plate D5585 ("TARGET VEHICLE"). The vehicle is used by Devin GRAY. The vehicle license is listed as a dealer license plate.   A query was completed on the license plate with no results. TARGET VEHICLE is seen in the below photograph:



**Attachment A4**
**Cellular Phone to be Searched**

The cellular device assigned call number 667-379-4122 with an unknown subscriber and/or

subscriber address with service provided by Verizon, and believed to be used by Devin GRAY.

**<u>Attachment A5</u>**
**Cell Phone to be Searched**

The cellular device assigned call number 443-931-6621 with an IMEI of 352853886049085 with a subscriber of Crystal Smith with a subscriber address of 1831 Druid Hill Avenue, Baltimore, Maryland 21217 and service provided by AT&T.   It is believed this phone is used by Devin GRAY.

## ATTACHMENT B1
## (Items to be Seized)

a. Any and all controlled and dangerous substances, to include cocaine base (crack), and fentanyl;

b. Any and all firearms and ammunition including pistols, rifles, revolvers, and magazines;

c. Keys to the TARGET LOCATION and/or the TARGET VEHICLE;

d. Any and all paraphernalia used in the manufacture, preparation, packaging, or weighing of illegal narcotics in preparation for distribution, to include, scales, plastic bags, gelatin capsules, vials, cutting agents (such as Mannitol and Quinine), and kilogram wrappers;

e. Currency or currency equivalents;

f. Records of narcotics transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

g. Financial records, financial instruments and other records or documents reflecting or the disposition of drug proceeds, including, but not limited to, currency, bank checks, cashier's checks, Western Union receipts, money orders, stocks, bonds, jewelry, precious metals, and bank and real estate records;

h. Books, records and other documents that identify other co-conspirators, including, but not limited to: address books, telephone books, rolodexes, and notes reflecting telephone and pager numbers, and audiotape recordings of conversations, including those made over telephone answering machines;

i. Telephones and Cellular Telephones, pagers, and personal digital assistants and any names, addresses, telephone numbers, and codes stored therein, and indicia of ownership of these communications devices, including boxes, manuals, chargers, receipts, and phone bills, including but not limited to the telephones assigned call numbers, 667-379-4122 and 443-931-6621.

j. Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

k. Photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film);

l. Records of travel including, but not limited to, tickets, transportation schedules, passports, notes and receipts related to travel, luggage tags, and motel/hotel receipts;

m. Identification documents;

n. Indicia of occupancy, residency, ownership or lease of the Target Location, including but not limited to keys, photographs, utility and telephone bills, other mail, and other documents; and

o. Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, storage lockers, safety deposit boxes, locked cabinets and other types of locked or closed containers, and hidden compartments that may contain any of the foregoing.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.  If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.    The investigative team may continue to review any information not segregated as potentially privileged.

Items of potential forensic value will be recovered and processed using a variety of means employed by forensic evidence technicians and specialists. Recovery of these items may result in damage to property. These recovery methods may include, but are not limited to, removing sections of tile, flooring, drywall, plaster, drain plumbing, or by employing other methods of recovery in locations where investigators believe the presence of forensic evidence may be present.

## Attachment B2
### (Items to be Seized from TARGET TELEPHONES)

This warrant authorizes the search and seizure of all records contained within the following TARGET TELEPHONES, that relate to violations of the SUBJECT OFFENSES, by Devon GRAY and his known and unknown co-conspirators.   The information and records to be seized in connection with the above are including, but not limited to:

a.    evidence of who used, owned, or controlled the TARGET TELEPHONES at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.    Call logs reflecting date and time of received calls;

c.    Any and all digital images and videos of persons associated with this investigation;

d.    Text messages to and from the TARGET TELEPHONES that refer or relate to the crimes under investigation;

e.    Records of incoming and outgoing voice communications that refer or relate to the crimes under investigation;

f.    Voicemails that refer or relate to the crimes under investigation;

g.    Voice recordings that refer or relate to the crimes under investigation;

h.    Any data reflecting the TARGET TELEPHONES' locations;

i.    Contact lists;

j.    Any and all records related to the location of the user(s) of the devices;

k.    evidence of software that would allow others to control the TARGET TELEPHONES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

l.    evidence of the lack of such malicious software;

m.    evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

26

n.      evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

o.      evidence of the attachment to the TARGET TELEPHONES of other storage devices or similar containers for electronic evidence;

p.      evidence of programs (and associated data) that are designed to eliminate data from the TARGET TELEPHONES;

q.      evidence of the times the TARGET TELEPHONES was used;

r.      passwords, encryption keys, and other access devices that may be necessary to access the TARGET TELEPHONES that are found stored within the TARGET TELEPHONES;

s.      records of or information about Internet Protocol addresses used by the TARGET TELEPHONES;

t.      records of or information about the TARGET TELEPHONES' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

u.      contextual information necessary to understand the evidence described in this attachment;

v.      records and information relating to distribution of controlled substances and other TARGET OFFENSES;

w.      records and information relating to the identity or location of the persons suspected of violating the statutes described above;

x.      Records, information, and items relating to violations of the statutes described above including; and

y.      data from third-party applications (including social media applications like Facebook and Instagram and messaging programs like WhatsApp and Snapchat).

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical,

or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

**BIOMETRIC DEVICE UNLOCK**:   During the execution of the search of the TARGET LOCATION, TARGET VEHICLE, and/or the person or Devon GRAY, law enforcement personnel are authorized to search the TARGET TELEPHONES and unlock them by: (1) pressing or swiping the fingers (including thumbs) of GRAY to the fingerprint scanner of the TARGET TELEPHONES; (2) holding the TARGET TELEPHONES in front of the face of GRAY to activate the facial recognition feature; and/or (3) holding the TARGET TELEPHONES in front of the face of GRAY to activate the iris recognition feature, for the purpose of attempting to unlock the device(s), and attempting to access data contained in the TARGET TELEPHONES, in order to search the contents as authorized by these warrants.

With respect to the search of any of the cell phones, computers and items described above (including the TARGET TELEPHONES) which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, to minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

a.      Surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

b.      "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c.      "scanning" storage areas to discover and possible recover recently deleted files;

d.      "scanning" storage areas for deliberately hidden files; or

e.      Performing keyword searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

If after performing these procedures, the directories, files or storage areas do not reveal evidence of the TARGET OFFENSES other criminal activity, or evidence of who owns or uses the device, the further search of that particular directory, file or storage area, shall cease.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.  If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.    The investigative team may continue to review any information not segregated as potentially privileged.

Items of potential forensic value will be recovered and processed using a variety of means employed by forensic evidence technicians and specialists. Recovery of these items may result in damage to property. These recovery methods may include, but are not limited to, removing sections of tile, flooring, drywall, plaster, drain plumbing, or by employing other methods of recovery in locations where investigators believe the presence of forensic evidence may be present.